In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-1240

GEORGE A. PLESSINGER, II,

*Plaintiff-Appellant,*

*v.*

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 17-CV-71 — **William C. Lee**, *Judge.*

ARGUED JULY 6, 2018 — DECIDED AUGUST 20, 2018

Before SYKES, HAMILTON, and BRENNAN, *Circuit Judges.*

HAMILTON, *Circuit Judge.* George Plessinger applied for
disability insurance benefits under the Social Security Act
based on his chronic back pain. An administrative law judge
found that he was severely impaired by his lumbar degener-
ative disc disease and stenosis, thoracic degenerative disc dis-
ease, obesity, and systemic hypertension. Given the stringent
standard for total disability under the Social Security Act,

however, the ALJ found that these impairments were not dis-
abling. The agency's Appeals Council denied review, and the
district court upheld the ALJ's decision. We reverse and re-
mand to the agency. In the face of the great weight of medical
evidence supporting Plessinger's claims of disabling impair-
ments, the ALJ gave undue weight to the opinion of the testi-
fying medical expert, who did not examine Plessinger and
hedged his opinion in a critical way that was never resolved.
The ALJ and the testifying medical expert each seemed to del-
egate to the other the job of evaluating the credibility of Ples-
singer's complaints of pain. The ALJ's decision to discount the
credibility of those complaints was not supported by substan-
tial evidence.

I.   *Factual and Procedural Background*

Plessinger was born with congenital spinal stenosis. He
began experiencing back pain in 2010, when he was just 23
years old. He worked as a diesel mechanic, electric lineman,
fast food worker, welder, and truck driver. But in April 2012
he was in an accident that exacerbated a prior injury from fall-
ing at work. He had epidural nerve block injections in August
2012, but they did not relieve his pain. An MRI scan revealed
a disc rupture in his lumbar spine, so he had surgery in March
2013.

In May and September 2013, in connection with Ples-
singer's application for Social Security disability benefits,
non-examining consultants for the agency assessed his resid-
ual functional capacity, meaning his abilities to do various
work-related activities on a sustained basis. Dr. J.V. Cocoran
determined that Plessinger had the residual functional capac-
ity to perform light work, while Dr. J. Sands determined he
could perform only sedentary work. Specifically, Dr. Cocoran

found that Plessinger could stand or walk for about six hours in an eight-hour workday. Dr. Sands, on the other hand, found that Plessinger could stand or walk for a total of only two hours per day and noted that he had "objectively supported back problems that are significant for someone his age."

Unfortunately, Plessinger's 2013 surgery did not relieve his chronic pain. He was later diagnosed with failed back surgery syndrome, which is also called post-laminectomy syndrome. Plessinger's neurosurgeon, Dr. Jeffrey Kachmann, referred him to a pain management doctor, Dr. Neal Coleman, to see if more conservative treatment could forestall a second surgery. Dr. Coleman examined Plessinger in February 2015 and noted that he could walk only 50 yards before his legs began to tingle. Dr. Coleman's notes indicate that Plessinger's four different daily pain medications reduced his symptoms, but his pain was aggravated by daily activities, including "lifting, lying/rest, rolling over in bed, sitting, standing and walking." Dr. Coleman also noted that Plessinger's spinal stenosis was "symptomatic and function limiting" and did not respond to injection therapies or other conservative pain management approaches.

Dr. Coleman referred Plessinger to another neurosurgeon to assess whether a second surgery would be appropriate. Dr. Guatam Phookan examined him in March 2015. He noted disc herniation in several parts of Plessinger's spine, and diagnosed "referred/radicular pain" in both legs. Dr. Phookan noted that Plessinger was already living with failed back surgery syndrome and that his herniations were not in the same part of the spine where he was experiencing the most pain.

Dr. Phookan determined that it would be best to explore other options for pain relief before attempting a second surgery.

Plessinger was examined by the agency's consulting examiner, Dr. Xavier Laurente, in July 2014. Dr. Laurente determined that Plessinger could walk only 20 to 30 feet and could stand for only five minutes at a time. He noted that Plessinger had limited strength in his legs and showed "some signs of nerve impingement (with positive straight leg raise test)."

At his hearing before the ALJ in April 2015, Plessinger testified about his physical limitations. He explained that he did his best to help his wife take care of their five young children, all under ten years old. He said that on a typical day, he would wake up at 6:00 a.m. to wake the children up for school, then lie back down for half an hour while they were getting ready, then get up again to make sure they were dressed and to get them on the school bus. After that he would lie down again before getting up again at 11:00 to make lunch for himself and his youngest children. He would then take care of the children until his wife got home from work.

Plessinger also explained that he had difficulty walking because of the "shooting pain" he experienced when moving around. He testified that if he walked more than ten feet, his legs went numb, so most of the time he either lay down in bed to ease the pain or sat in his chair. He said the pain also interfered with his sleep, allowing him to sleep only two to three hours at a time, followed by tossing and turning because of the pain. As for daily activities, he said that it took him all day to wash a load of dishes because he had to take frequent breaks to allow his back to decompress and to "get the feeling back in [his] legs."

Dr. John Pella, a physician certified in internal medicine and specializing in pulmonary disease, also testified at the hearing as a medical expert. He had reviewed Plessinger's medical records but had not examined him. Dr. Pella began by briefly summarizing the results of Plessinger's most recent MRI from August 2014, which revealed several areas of disc extrusion and root effacement. He also noted that Plessinger had a history of hypertension and was significantly obese, with a body-mass index of 45.

When Dr. Pella had finished describing Plessinger's physical conditions, the ALJ asked whether his impairments met or equaled any impairment listed in Social Security regulations that leads to a presumption of disability. Dr. Pella said no. The ALJ did not ask about any particular listing or set forth requirements for any. Dr. Pella did not explain which listings would be most relevant or explain why he did not believe any listed impairment was met.

Dr. Pella then concluded that Plessinger would be able to lift and carry 20 pounds occasionally and ten pounds frequently; to sit for two hours at a time for a total of six hours of an eight-hour workday, with a sit/stand option; to stand for 30 minutes to one hour at a time, and to walk for 15 to 30 minutes at a time, for two to three hours total in a workday; and to reach, push, or pull overhead frequently, but could use his legs only occasionally.

A vocational expert also testified regarding Plessinger's work-related capabilities. The expert said that Plessinger could no longer do his past relevant work but could do unskilled sedentary work with the limitations described by the ALJ, identical to the limitations Dr. Pella had testified to earlier in the hearing. The vocational expert said the specific jobs

available to Plessinger would include a surveillance systems monitor, a parimutuel ticket checker, and a document preparer. The ALJ also asked the vocational expert whether those jobs would still be available if the hypothetical individual, to relieve symptoms, must lie down several times during the day, as Plessinger testified was necessary. The vocational expert replied that the jobs identified would not be possible and that no competitive employment could be achieved with that restriction.

The ALJ applied the standard five-step analysis for assessing disability, see 20 C.F.R. § 404.1520(a), and concluded that Plessinger was not disabled. At step one, the ALJ determined that Plessinger had not engaged in substantial gainful activity since his alleged onset in December 2012. At step two, the ALJ identified as "severe" Plessinger's lumbar degenerative disc disease and stenosis, thoracic degenerative disc disease, obesity, and systemic hypertension. At step three, based exclusively on Dr. Pella's assessment, the ALJ concluded that these impairments, individually or in combination, did not satisfy a listing for presumptive disability.

Step four required the ALJ to determine Plessinger's residual functional capacity and determine whether he could do his past relevant work. The ALJ found that his impairments "could reasonably be expected to cause the alleged symptoms," but concluded "his purely subjective complaints are given less than full credibility and little weight" because they were "not reasonably consistent with the overall evidence of record." The ALJ then listed the factors that must be considered when assessing the credibility of an individual's statements, see 20 C.F.R. § 404.1529(c), but did not return to those

factors to explain his finding that Plessinger was "not entirely credible."

The ALJ wrote that he gave "great weight" to the opinion of Dr. Pella because his testimony showed "a careful analysis of the claimant's impairments" and "was based on a thorough review of evidence." Further, the ALJ said he found Dr. Pella's determinations credible because they were "supported by objective clinical findings and treating progress notes in the record." The ALJ did not specify which findings and notes he meant.

By contrast, the ALJ discounted the assessments of several consulting physicians, and he did not assign any particular weight to the assessment of Plessinger's treating physicians. The ALJ said he gave only little weight to the opinions of Dr. Laurente, the agency's consulting examiner, and to the opinions of Dr. Cocoran and Dr. Sands, the non-examining state-agency physicians, because he found their opinions inconsistent with the other diagnostic and clinical findings, and because they lacked access to the longitudinal medical record.

The ALJ then briefly discussed some of the findings of Plessinger's treating physicians but did not assign them any particular weight. He focused only on their findings that supported Dr. Pella's assessment of residual functional capacity. For example, the ALJ mentioned that Dr. Coleman's February 2015 examination of Plessinger revealed that his spine was positive for posterior tenderness, but that a neurological exam was "within normal limits" and his MRI indicated little change from the earlier MRI. The ALJ omitted any mention of Dr. Coleman's clinical assessment that Plessinger "can walk less than 50 yards" before his legs tingle, and that his spinal

stenosis was "symptomatic and function limiting" and was "not responding to conservative and injection therapies."

Similarly, the ALJ noted that Dr. Phookan "indicated that the claimant was not a surgical candidate." The ALJ omitted Dr. Phookan's explanation for *why* a lumbar discectomy at the L3-L4 and L4-5 hernia locations might not be the right strategy for Plessinger: he was already experiencing failed back surgery syndrome, and his pain was mostly concentrated in his axial low back rather than in his right leg. Dr. Phookan also noted that if other treatment options did not work, he would still consider a second surgery.

At step four, the ALJ thus concluded that Plessinger had the residual functional capacity to perform sedentary work with certain restrictions that would not allow him to perform any of his past relevant work as a welder or truck driver. At step five, however, the ALJ found that sedentary and unskilled jobs existed in significant numbers in the national economy that Plessinger could perform, including those that the vocational expert identified. The ALJ therefore denied benefits.

## II. *Analysis*

The ALJ's decision was based on two related errors that require remand. First, the ALJ relied too heavily on Dr. Pella's testimony without explaining adequately why he was discounting the opinions of physicians who had treated and examined Plessinger. Second, the ALJ's decision to discount the credibility of Plessinger's account of his pain and its limiting effects on him was erroneous. The ALJ relied heavily on Dr. Pella, who qualified his opinions by signaling that he had not taken into account Plessinger's complaints and that someone

else—the ALJ—would need to assess the credibility of those complaints. In essence, Dr. Pella and the ALJ each deferred to the other on that critical issue. The ALJ never fully engaged with the evidence supporting Plessinger's claim of disabling pain. There is also a third problem with the ALJ's opinion: it failed to explain why Plessinger did not meet or equal Listing 1.04A for spinal disorders, which would lead to a finding of presumptive disability. Because of issues of waiver and whether Plessinger met his burden of proof on this issue, we do not rely on this point to remand. Since the case must go back to the agency on other grounds, the listing issue will need to be addressed on remand.

On appeal, Plessinger argues that the ALJ relied too heavily on Dr. Pella's testimony and gave too little weight to his other doctors' opinions. Plessinger points out that Dr. Pella is not an expert in orthopedics or neurology, the areas of medicine most relevant to Plessinger's impairments. Rather, Dr. Pella is a career pulmonologist (lung specialist) who did his residency in internal medicine many years ago.

An ALJ may have a medical expert assist with interpreting the record evidence. See 20 C.F.R. § 404.1512(b)(1)(viii) (2017). Dr. Pella's specialty in pulmonology did not disqualify him as a matter of law from being able to opine on the meaning of Plessinger's medical records. See *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). Nevertheless, the ALJ erred by giving Dr. Pella's testimony greater weight than was appropriate based on the factors the regulations identify for assessing medical opinions. See 20 C.F.R. § 404.1527(c)(2)–(5). The ALJ said he gave Dr. Pella's opinion "great weight" because it was "based on a thorough review of evidence" and because, the ALJ wrote, his determinations were supported by the record.

Dr. Pella's opinion was certainly admissible, but there are several problems here. Dr. Pella never examined Plessinger, had no treatment relationship with him, see § 404.1527(c)(2)(i) (more weight given to doctors with a longer treatment relationship), and is not an expert in orthopedics or neurology, see § 404.1527(c)(5) (more weight given to opinion of specialist about medical issues related to area of specialty). The ALJ assumed that Dr. Pella was familiar with all of the medical evidence, both supporting and undermining the claim of disability, but did not point to the corroborating record evidence.

The most fundamental error is that the ALJ accepted Dr. Pella's opinions without recognizing the limits that Dr. Pella himself imposed on them. Dr. Pella acknowledged that his opinions did not take into account Plessinger's own account of the disabling effects of his pain. Dr. Pella concluded his opinion on Plessinger's residual functional capacity by saying that "any further impairment would be related to credibility of pain on his function, Your Honor." A few minutes later, Plessinger's attorney asked Dr. Pella why he believed Plessinger was capable of longer periods of sitting, standing, and walking than the agency's consultative examiners did. Dr. Pella answered: " … I think that would be based on a credibility of, of pain on his function."

These answers indicated honestly what seems obvious. Having not even examined Plessinger, Dr. Pella was not in a position to evaluate the credibility of his account of the pain he suffered. Dr. Pella was saying, in other words, that someone else—presumably the ALJ—would need to assess those issues to make a sound decision based on all the evidence in the case. The ALJ cannot delegate to any doctor, and certainly

not to a non-examining doctor, the task of evaluating the claimant's credibility.

By contrast, the ALJ referred only briefly in his opinion to the clinical findings of Dr. Coleman, the doctor who had one of the longest treatment relationships with Plessinger, from July 2013 to February 2015. Dr. Coleman's assessment of Plessinger's ability to walk (only 50 yards before his legs started to tingle) was not consistent with Dr. Pella's testimony that Plessinger could walk for 15 to 30 minutes at one time. The ALJ did not explain why he favored Dr. Pella's opinion over Dr. Coleman's. See *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017) ("A treating physician's opinion trumps the conclusions of agency consultants—in particular those who never examined the claimant—unless the limitations articulated by the treating physician are not supported by the record.").

The ALJ also seemed to have misconstrued (or worse, "cherry-picked") the evidence from Dr. Phookan's March 2015 assessment that surgery might not be the best treatment option for Plessinger. The ALJ treated this opinion as if it showed that Plessinger's condition was not severe enough for surgery. Actually, Dr. Phookan's full assessment undermines that view. He pointed out that Plessinger was suffering from failed back surgery syndrome, which meant that surgery was less promising than it would otherwise be, despite the pain Plessinger was suffering. Dr. Phookan also pointed out that surgery where Plessinger's herniated discs were located might not address the part of the back where he reported experiencing the most pain. ALJs are not permitted to cherry-pick evidence from the record to support their conclusions,

without engaging with the evidence that weighs against their findings. See *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014).

Approaching the case in terms of the ALJ's credibility finding, we also find we must reverse and remand. Plessinger's own account of his pain and resulting limitations showed, if believed, pain and effects that rendered him totally disabled and eligible for benefits.

The ALJ recognized correctly that Plessinger's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but the ALJ found that his "purely subjective complaints are given less than full credibility" because they were not consistent with the overall evidence in the record. The ALJ also stated in his opinion the proper test for analyzing a claimant's credibility.

The ALJ failed, however, to actually conduct that analysis himself. He instead deferred entirely to the testimony of Dr. Pella. The ALJ's only explanation for finding Plessinger "not entirely credible" was that his "subjective complaints" were "not reasonably consistent with the overall evidence of record." This is language that this court has criticized as "meaningless boilerplate" if the ALJ does not offer more of an explanation for the purported inconsistencies. *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016).

The ALJ did not really explain, for example, why he did not believe Plessinger's testimony that he could not walk more than a very short distance and had to lie down several times during the day to manage his pain—testimony which, if believed, would preclude competitive employment according to the vocational expert. The ALJ also did not address the fact that Plessinger's allegations of pain were consistent with

the strong prescription pain medication he was taking. See, e.g., *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (finding doctor's prescription for strong pain medications corroborated claimant's credibility regarding pain).

The ALJ's unsupported credibility assessment provides by itself sufficient reason to remand here. *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) ("An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding."). We must repeat here that Dr. Pella twice qualified his own opinion about Plessinger's residual capacity. He concluded his opinion by saying that "any further impairment would be related to credibility of pain on his function," and he repeated the same qualification when Plessinger's attorney challenged his opinion. These answers indicated that Dr. Pella was leaving to the ALJ the job of determining how credible Plessinger's complaints of pain were. As noted, Dr. Pella had not examined Plessinger. He was not in any position to offer his own opinion about credibility or possible exaggeration or even malingering. (There is no indication from any physician who examined or treated Plessinger that he has been malingering or exaggerating his symptoms.) That qualification of Dr. Pella's opinion made clear that the ALJ would need to make his own assessment of Plessinger's credibility before accepting Dr. Pella's opinion about residual functional capacity.

On appeal, Plessinger also argues that the ALJ erred by relying on Dr. Pella's testimony to find that he was not presumptively disabled under Listing 1.04A for "Disorders of the spine," including spinal stenosis and degenerative disc disease. See 20 C.F.R. Part 404, Subpart P, App'x 1, § 1.04A.

The Commissioner contends that Plessinger waived any argument based on the listings because he did not raise the issue before the district court. Plessinger argued broadly in the district court that the ALJ failed to explain his analysis of the evidence with enough detail to permit meaningful appellate review. We have treated such arguments as enough to preserve more specific arguments. See *Arnett v. Astrue*, 676 F.3d 586, 593–94 (7th Cir. 2012) (finding claimant's argument regarding specific part of the ALJ's residual functional capacity analysis was not waived on appeal because claimant raised issue of the ALJ's overall residual functional capacity finding in district court). We need not reach a definitive conclusion on the issue of waiver, though, because the case must be remanded on other grounds.

Listing 1.04 requires a spinal disorder, such as degenerative disc disease or spinal stenosis "resulting in compromise of a nerve root … or the spinal cord," plus one of three alternatives. Alternative A is "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Dr. Coleman noted that Plessinger had a positive straight-leg test in February 2015, as well as "new left L4 radiculopathy with numbness and motor weakness for the past 4 weeks." And Dr. Laurente noted in his July 2014 exam of Plessinger that he had "some signs of nerve impingement (with positive straight leg raise test)."

Here was the ALJ's entire explanation for finding that Plessinger did not have an impairment meeting a listed impairment:

> John Pella, M.D., a board certified internist and an impartial medical expert, had the opportunity to review the medical evidence of record and testify at the hearing. Dr. Pella testified that the physical impairments, considered singly or in combination, do not meet or equal any section of the listed impairments.

Given the substantial evidence from treating and examining physicians tending to show that Plessinger may have met or equaled Listing 1.04A, this was not a sufficient explanation of the ALJ's reasoning. It would not allow this court to undertake a "meaningful review" of the ALJ's finding that Plessinger did not satisfy Listing 1.04A. *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012). We could not "discern from the ALJ's scant analysis whether [he] considered and dismissed, or completely failed to consider, this pertinent evidence," so the ALJ did not "build a logical bridge" from the evidence to his conclusion. *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015), citing *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). This issue will need a fresh look on remand.

The judgment of the district court upholding the ALJ's denial of benefits is REVERSED and the case is REMANDED to the agency for further proceedings consistent with this opinion.